Filed 11/1/21  P. v. Brandon CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER LAMAR BRANDON, et al.,<br><br>    Defendants and Appellants. | B300932<br><br>(Los Angeles County<br>Super. Ct. No. MA073477) |

APPEALS from judgments of the Superior Court of the County of Los Angeles, Daviann L. Mitchell, Judge.  Affirmed, in part, reversed, in part, and remanded with directions.

Tanya Dellaca, under appointment by the Court of Appeal, for Defendant and Appellant Christopher Lamar Brandon.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant Acorri Patton.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan

Pithey, Senior Assistant Attorney General, Scott A. Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## I.  INTRODUCTION

In a joint trial, separate juries found defendants Christopher Lamar Brandon and Acorri Patton guilty of first degree felony murder and first degree robbery and also found true, among others, robbery and burglary special circumstance allegations.  On appeal, they contend that there was insufficient evidence to support the felony murder and special circumstance findings and that they received ineffective assistance of counsel.  They also raise various other challenges, individually and jointly, including to certain aspects of their sentences.  We vacate the murder conviction and special circumstance findings as to Patton and remand to the trial court with directions to conduct a resentencing hearing as to Patton and to modify the sentence as to Brandon.  We otherwise affirm.

## II.  FACTUAL BACKGROUND

A.  *The Victim*

In August 2017, 64-year old Vincent Roper (the victim) lived alone in a two-story home on Patty Court in Palmdale.  He kept his home "very clean" and "very neat and orderly."

Marquisha Kirklin, a friend of the victim's daughter, saw the victim a few times a week and spoke to him almost daily. According to Kirklin, the victim liked to cook and she had seen him using pots and pans while cooking. None of the pots and pans she had seen him use had dents in them or handles broken off.

Francis Tulanda had been married to the victim's daughter for 10 years, but the two divorced in January 2017. Brandon was Tulanda's long-time friend and had attended Tulanda's wedding to the victim's daughter.

B. *Events Prior to the Victim's Murder*

Two or three months before his death, the victim told Kirklin that he "'[g]ot one over' on . . . Tulanda[.]" The victim also told his daughter that he "'fucked'" Tulanda. Kirklin understood that the victim was referring to money or drugs when he made those statements.

Around the Monday before his murder, Kirklin took the victim to a doctor's appointment. The following Wednesday morning, the victim texted Kirklin, and that was the last time she heard from him.

When Kirklin did not hear from the victim by Friday, August 25, 2017, she became worried. She texted and called him but received no replies. On Friday morning, Kirklin and her husband went to the victim's house to check on him. As she walked toward the front door, she saw what looked like a "muddy [footprint]." Kirklin tried the front doorknob, and it was unlocked. As she pushed open the door, she saw that the house had been ransacked. Once she saw the condition of the interior of

3

the house, she did not venture further inside.  Instead, she called 911.

C.    *Murder Scene*

On August 25, 2017, deputies with the Los Angeles County Sheriff's Department responded to the victim's home.  When the deputies entered the house, they observed glass fragments and broken picture frames on the floor.  It looked like the living room furniture had been "thrown around."  The deputies observed footprints "traveling to and from th[e] front door" and shoe impressions on an outdoor mat as well.  Investigators determined there were three distinct types of shoe impressions left at the scene; two different types of shoe impressions were from larger shoes and one other type was left by smaller shoes.

Inside the front door, there was broken glass, shoe impressions, and photographs on the tile entryway floor, as well as damaged photographs and other intact photographs hanging on the wall facing the door.  In the living room adjacent to the entryway, there was a bicycle that had fallen, couches that had been moved, and more shoe impressions.  The living room appeared "to be disheveled[, as if] a fight occurred in th[e] residence, and there was blood throughout that room."  There also were "pots, handles, [and] numerous items" in that room.  One pot was dented and had a handle broken off.  There were bloodstains on the pot and the couch.

The deceased victim was lying face down on the floor of the kitchen.  At the entrance to the kitchen from the living room, there was a pink canister of pepper spray.  In the kitchen itself, there was a "lot of blood throughout the kitchen floor, [on]

4

kitchen cabinets, [and on the] refrigerator.  There [were] numerous [other items, including] a grease fryer, pots, pans, and . . . dry blood."[1]

On the stairway leading to the second story, there were bloody shoe prints going up the stairs and bloodstains on the railings and walls.

In the second-story master bedroom, there were bloodstains on the bed cover and, in the closet, there was a broken broom handle near where the carpet and padding had been pulled up to expose the wood floor underneath.  The deputies also found a gun inside a dresser drawer.

In the rear second-story bedroom, there were significant bloodstains on the wall upon entry, including bloodstains near the light switch.  An investigating detective also noticed blankets on the ground, drawers opened, and more bloodstains.  In the closet, the carpet and padding had been pulled up, as well as a square portion of the plywood flooring.  Where the plywood had been removed, there was "a hollow space . . . at the bottom of the closet" with a bloodstained knife in it.  From the condition of the hollow space, the detective determined that "something was there and [had been] taken."

D.    *Autopsy*

A deputy medical examiner for the Los Angeles County Department of Medical Examiner-Coroner performed the autopsy of the victim and determined that he suffered a total of seven sharp force wounds—six to his head and one to his face.  The

---

[1]    A criminalist testified that a deep fryer found in the kitchen was "heavily dented."

5

victim also had a contusion to the chest, abrasions to the back of one arm, an abrasion to the upper back, and two broken ribs.

The medical examiner concluded that the victim died from exsanguination from stab wounds, i.e., he bled to death. The stab wounds caused hemorrhaging from the wounds and the blunt force trauma to the victim's head caused hemorrhaging into tissue. Given the amount of blood around the victim, as shown in the crime scene photos, it would have "taken [the victim] minutes, but not hours, to die."

E.    *DNA Evidence*

A criminalist for the Los Angeles County Sheriff's Department crime laboratory compared certain samples taken from the victim's home against defendants' DNA. The DNA profile obtained from a bloodstain on the interior face of the victim's front door matched Brandon's DNA profile. Brandon's DNA profile also matched the sample taken from a bloodstain on the coffee table in the living room. The DNA profile obtained from the pink canister of pepper spray was consistent with at least three contributors, two of whom were Patton and the victim.

F.    *Brandon's Arrest*[2]

On March 22, 2018, Detective Joseph Valencia went to a residence on East 113th Street in Los Angles. Deputies had observed Brandon at the residence during an earlier surveillance operation and Brandon provided this as his address during his

[2]    The evidence about the details of Brandon's arrest was presented only to his jury.

booking.  When the detective arrived at the scene, Brandon's family members at the residence[3] directed him to the converted garage.  The garage appeared to be a living quarters because it contained a bed, personal belongings, and its own bathroom.  It also had a computer system, recording and sound mixing equipment, foam sound proofing on the walls, and headsets.

On the bed in the converted garage, a deputy saw a Crown Royal bag that contained a loaded semiautomatic handgun.  Another deputy recovered ammunition from the garage in "a few different calibers."

G.    Perkins[4] *Operation*

During the course of his investigation, Detective John Duncan identified Tulanda and Brandon as suspects in the murder.  On March 22, 2018, Tulanda and Brandon were arrested.  That same day, detectives conducted a *Perkins*

---

[3]    The detective saw four or five people at the residence, including children and an elderly woman.

[4]    "*In Illinois v. Perkins* (1990) 496 U.S. 292 . . . [(*Perkins*)], the United States Supreme Court held that a criminal suspect who makes incriminating statements is not entitled to *Miranda* warnings 'when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement.' (*Id.* at p. 294; see *Miranda v. Arizona* (1966) 384 U.S. 436 . . . [(*Miranda*)]; see also *People v. Williams* (1988) 44 Cal.3d 1127, 1141–1142 . . . [stating *Miranda* 'has never been applied to conversations between an inmate and an undercover agent'].)" (*People v. Foster* (2021) 61 Cal.App.5th 430, 434, fn.1.)

7

operation.[5]  At the beginning of the operation, Brandon was placed in a cell with the *Perkins* agent, who engaged him in conversation about the reasons for and the circumstances of their respective arrests.  Brandon told the agent that he shot "videos.  [He] engineer[ed], produced.  [He did] music."

A short time later, a deputy interrupted Brandon and the agent, informing Brandon that he was being charged with murder and confirming for Brandon that his bail was $1 million.

The agent and Brandon then proceeded to discuss whether the detectives had any incriminating information, with Brandon surmising that they may know about his phone.  When the agent asked if there was someone else involved, Brandon replied, "A bitch."  According to Brandon, he "was just with her" and she had his phone, but she "got rid of it" "that same day."  The agent responded, "[W]hat the broad got to do with it though?" and Brandon replied, "[S]he met this motherfucker . . . ."

At that point, a deputy placed Tulanda in the cell with Brandon, but the two men acted as if they were strangers.  Brandon was then removed from the cell, leaving Tulanda alone with the agent.  The agent proceeded to engage Tulanda in conversation, during which the agent explained that he was originally arrested for a fight that put his opponent in a coma.  In response, Tulanda commented that he "got into a fight with someone too," complaining that investigators were "trying to say [he] killed someone, but [he] didn't do it.  [He] got into a fight . . . .  [But he did]n't know what happened to [the victim] after that."  According to Tulanda, "[the victim] didn't die, when [he]

---

[5]  A detective described a *Perkins* operation as a planned procedure during which investigators place a criminal suspect in a cell with an undercover agent and record their conversations.

8

was there, so [he didn't] know what happened after [he] was gone."

The agent next asked where Tulanda and the victim fought, and Tulanda replied, "At [the victim's] house.  He . . . owed [Tulanda] some money," "[a] lot of [money] . . . ."  The agent followed up, inquiring how much the victim owed, and Tulanda replied, "Sixty grand."  The agent then asked whether Tulanda got his money back, and Tulanda said, "No," the victim "had spent it already."  Tulanda mused that he "should have just left it alone."  Asked why the victim owed him $60,000, Tulanda said it was for "[w]eed."

Tulanda added:  "So when I tried to go back to get it, (INAUDIBLE) all my shit was done.  So I'm like, bro where is my money?  He pulled out a gun on me, he's like, it's mine now.  I'm like are you serious?  O.K.  Alright."

Tulanda maintained that he then went back for his money alone, without a gun, and "[w]hooped [the victim's] ass."  But he did not go "there to kill [the victim.  He] didn't want him to die."  He "just wanted to get [his] shit" and to "[t]each [the victim] a lesson."  Tulanda also claimed that he asked the victim "for the money first."  But the victim "started giving [Tulanda] some bullshit, so [he] just whoop, whoop, whoop."  Tulanda again confirmed that no one went with him, "no big homeys . . . or nothing[.]"

The agent asked what Tulanda "hit [the victim] with," and Tulanda replied, "Man, just my fists."  Tulanda then apparently showed the agent his finger, stating, "That shit broke when I (INAUDIBLE) [the victim]."  The agent responded, "It broke?  Damn.  It's still broke," to which Tulanda replied, "Yeah.  . . . [T]his bent to the side."  The agent was curious whether the

9

victim "went out," prompting Tulanda to explain that the victim "went out," but then "woke up" two minutes later when "we looked for the money" "[a]round the house . . . ."  Tulanda was certain the victim had a safe, but he "just couldn't find it."

Deputies then entered the cell and exchanged Brandon for Tulanda, whom the agent immediately engaged in conversation. The agent told Brandon that Tulanda "was saying something about he . . . whooped on somebody.  He [stole] something.  [¶] . . . [¶] . . . But he said he was by himself."  Brandon responded by admitting that he knew Tulanda.

When Brandon informed the agent that Tulanda got his money back, the agent replied that Tulanda "said it was like sixty" and asked how Tulanda got it "with[out a] burner," referring to a gun.  Brandon explained that he "sent [his] bitch . . . in there," apparently referring to Patton, because Brandon knew from Tulanda that the victim had previously pulled a gun on Tulanda.  Brandon also said that he had a sawed-off blower, i.e. shotgun, but had been forced by financial circumstances to sell it before the robbery.

According to Brandon, Patton advised him to "go in there with[out a] gun.  [She said they should] do it smooth[;] let [her] go in there and trick [the victim] out."  Because Patton did not know the victim, she would introduce herself by telling him that her son's "'drone fell in the [victim's] back[yard].'"

Brandon then changed the topic to his interview with detectives, saying that one of the detectives advised him that he had been arrested for murder.  When the agent asked how investigators could prove that charge, Brandon claimed that he did not leave any blood at the scene and that he could not have

left hair because it was "braided up." He also maintained that "[i]t was a[n] accident."

When the agent again focused on the money Tulanda took from the victim, Brandon disclosed that the victim was Tulanda's ex-father-in-law and that Tulanda knew the money was in a closet under the carpet. The agent wondered why Tulanda would beat the victim, prompting Brandon to speculate that the victim must have felt he was "in power" because he had a gun.

The agent next inquired, "[H]ow did [the victim] go out all the way?" Brandon reported that the victim said defiantly, "[F]uck that shit. . . . [Y]ou gunna kill me? (INAUDIBLE) You gotta kill me?" The agent then clarified, "But I'm talking about your (INAUDIBLE). That's what I'm saying (INAUDIBLE)[.]" Brandon explained, "(INAUDIBLE) hit [the victim] with pots. Like whatever around. So he don't get back up no more." The agent reiterated, "He finally didn't get up, huh?" and Brandon replied, "Hell yeah." Asked if the victim screamed, Brandon said no and added that there were no witnesses and that they had thrown the victim's phone away in the mountains.

Brandon reported that he was told by the deputy that his DNA was "'all over the house.'" When the agent offered that "other than having to wrestle with [the victim], it was easy," Brandon disagreed and responded, "Aw that shit wasn't easy."

The agent was curious why Brandon and his companions did not just wait until the victim left to rob the home. According to Brandon, the victim "had this Rottweiler, [an] ADT security [system, and a gun]. [And, they d]idn't know the [victim's] schedule." Brandon and his companions were also aware that any time the victim left his house, he armed the security system.

The agent returned to the extent of Patton's involvement, and Brandon explained that she went to the victim's house "for a blunt." When the victim stepped inside to "the kitchen to light it," Patton, who was sitting by the front door, signaled Tulanda and Brandon to come. The two men "jump[ed] over the gate and slid[] in—[and] that [was] when [Brandon and the victim ran] into each other" at the front door. A "wrestling match" ensued in the home's entryway during which Tulanda joined the fray and Patton closed the front door.

Brandon next detailed how Patton "low key saved [his] life . . . ." She was supposed to pepper spray the victim, but instead she sprayed Brandon in the mouth, causing him to lose his breath and sit on the couch to "try to get [his] wind." While Brandon was temporarily incapacitated, Patton "kept [the victim] down," "whacking [him] with the pot."

Deputies eventually returned Tulanda to the cell, where he and Brandon talked about their respective interviews. Deputies then removed the agent from the cell, and Tulanda asked Brandon what incriminating information the investigators had. Brandon said the detectives claimed to have blood evidence, but that was "bullshit. (INAUDIBLE) they d[id]n't have no blood."

Tulanda then wanted to know more about "Promise," i.e., Patton, and Brandon assured him that she was "straight" and that the investigators "d[id]n't have nothing on her." Following further conversation between Brandon and Tulanda, much of which was inaudible, the detectives ended the *Perkins* operation and escorted the two men to their respective cells.

12

## H. *Brandon's Interview*[6]

While the *Perkins* operation was ongoing, Detectives Duncan and Valencia took Brandon to a separate room to interview him. Before the interview, Detective Duncan advised Brandon of his *Miranda* rights. Brandon denied knowing the victim, denied having been in Palmdale, and claimed that it was "completely weird" that his blood had been found at the crime scene.

## I. *Arrest and Interview of Patton*[7]

Following the *Perkins* operation, Detective Valencia listened to jail house calls, trying to identify the woman Tulanda and Brandon referred to as "Promise." Among others, he listened to a call between Brandon and "Promise," during which she informed him that she was going to appear in court to clear up some warrants. In response, Brandon cautioned her not to allow deputies to "'swab'" her. Phone numbers provided during monitored calls were researched by a crime analyst who determined that they belonged to Patton.

On May 15, 2018, Detective Valencia took part in an operation to arrest Patton. That same day, he and Detective

---

[6]     Evidence concerning Brandon's interview with detectives, including the audio recording of it, was presented to Brandon's jury only.

[7]     Evidence concerning Patton's arrest and interview by detectives, including the audio recording of the interview, was presented to Patton's jury only.

13

Duncan interviewed her, and delivered certain advisements to her.[8]

Patton admitted that Brandon was her ex-boyfriend and that they met in September 2015, but claimed they broke up in December of that year. She "stopped talking to him for a long time because he was real abusive," and that was why "[she] left." Her family did not "want [her] around him."

Patton had heard through Brandon's mother that he had been arrested. But she denied being in contact with Brandon since he had been jailed. She also denied knowing Tulanda.

The detectives confronted Patton with information from the *Perkins* operation and accused her of lying. She then claimed that she "just got them in the house, and then that was it." She also asserted that she "didn't want nobody to get hurt." According to Patton, Tulanda said that the victim had robbed him at gunpoint of $100,000, so "they were just going to rob the guy back . . . ."

At first, the plan was for Tulanda and Brandon "to go by [themselves]. And then . . . [Brandon] changed the plan" and made Patton participate. Brandon did not want anyone "to get killed," so he needed Patton to "get them in the house . . . ."

The new plan was for Patton "'to use [her] sex appeal'" and "to put Visine in [the victim's] drink" so he would "go to sleep" and Tulanda and Brandon could gain entry to the house. Brandon told Patton "what to do, and [she] just did it." Brandon told Patton that "Visine makes people go to sleep. It don't kill him . . . ."

---

[8]   We discuss the details of the advisement in the discussion section below.

Patton first made contact with the victim after Brandon told her to knock on the door and tell him that her son's drone had fallen in his yard. Patton complied, exchanged phone numbers with the victim, and left.

The next day, Patton and Brandon stole Visine from a gas station to put in the victim's drink. According to Patton, she only placed three drops in the victim's drink because "she didn't want to over doze it." The Visine did not work as intended because the victim stayed up all night watching television. Patton drank and had sex with the victim and then fell asleep. In the morning, Patton dressed and left. Tulanda and Brandon were angry with her because she fell asleep.

Patton did not talk to the victim "for a couple of days after [she] had spent the night." But the victim eventually called her and "asked [her] to come over . . . ." Patton went to the victim's house and sat outside the front door drinking with him. The victim said Patton "could roll the blunt" and went into the house to get an item to break down the marijuana. Tulanda and Brandon then jumped over a gate and "rushed [the victim into] the house" as he was coming out of the front door. When Patton entered the house, she had to calm Brandon down because he could not breathe after Tulanda "sprayed the mace." She denied that she had sprayed Brandon, but admitted that she had handled the pink pepper spray container when she and Brandon purchased it.

The detectives then asked Patton to describe the events that took place after Tulanda and Brandon entered the house. She said that when the two men rushed in "they were all . . . fighting." Brandon had the victim in a chokehold and Tulanda "was trying to grab him too," but "he was . . . squirming and

15

fighting," "three big old guys just fighting . . . ." Tulanda was "holding [the victim] but he [was also] socking him in the face . . . ." The fight moved from the entryway to the living room and then to the kitchen where the men fell to the ground with Tulanda on top of the victim "punching him." Tulanda was "hitting [the victim] with his hands, and then . . . [i]t was all types of shit, just swinging and flying."

Patton saw Brandon grab a knife and stab the victim, but "[t]he knife wouldn't go through." Patton did not remember "exactly where [Brandon] was stabbing [the victim]," but she remembered him throwing the knife because "it didn't work." Then Brandon "started grabbing stuff because [the victim] wouldn't stop moving." Patton saw blood coming from the victim's head and became scared.

While the two men were assaulting the victim, Tulanda directed Patton to "go upstairs and get the money." He told her it was underneath the carpet in a bedroom closet. She complied and pulled up the carpet, but she couldn't pull up the "little square piece" of wood, so she asked Tulanda "for something to get it up with" but "they were still down there fighting." Tulanda eventually came upstairs with "a little hammer," and "popped it open," while Brandon was still "fighting [the victim]." Patton saw Tulanda take a safe from the space he had exposed.

Patton tried to convince Tulanda and Brandon to leave because she was scared. Tulanda told her to start cleaning up, but she protested, saying, "'No, let's just go. Let's just go.'" Patton started throwing pots and pans in the sink, but denied using them to hit the victim. Tulanda then gave her a towel and "told [her] to wipe up stuff." Patton said, "'No'" and ran out.

16

Patton went to the car and entered the passenger side. When Brandon and Tulanda "got done," they came to the car; Brandon entered the rear passenger seat and Tulanda, who was carrying a safe, entered the driver's seat. Brandon opened the safe with a pair of fingernail clippers, and Patton saw that there "was a [lot] of money [inside]."

## III.  PROCEDURAL BACKGROUND

Following a joint trial before separate juries, Brandon's jury found him guilty on count 1 of first degree murder in violation of Penal Code section 187, subdivision (a)[9]; on count 2 of first degree robbery in violation of section 211; and on count 3 of possession of a firearm by a felon in violation of section 29800, subdivision (a)(1).  His jury also found true:  the robbery and burglary special circumstance allegations within the meaning of section 190.2, subdivision (a)(17)(A) and (G); the personal use of a deadly weapon allegation within the meaning of section 12022, subdivision (b)(1); and the personal infliction of great bodily injury allegation within the meaning of section 12022.7, subdivision (a).

The trial court sentenced Brandon on count 1 to life without the possibility of parole, plus a one-year enhancement pursuant to section 667.5, subdivision (b); on count 2 to a high term of six years, plus an additional one-year term for the personal use of a weapon enhancement, and a three-year term for the great bodily injury enhancement, all of which the court

---

[9]     All further statutory references are to the Penal Code unless otherwise indicated.

17

stayed; and on count 3 to a consecutive two-year middle-term sentence.

Patton's jury found her guilty on count 1 of first degree murder in violation of section 187, subdivision (a) and on count 2 of first degree robbery in violation of section 211. Her jury also found true: the robbery and burglary special circumstance allegations within the meaning of section 190.2, subdivision (a)(17)(A) and (G); but found not true the personal use of a deadly weapon allegation within the meaning of section 12022, subdivision (b)(1) and the personal infliction of great bodily injury allegation within the meaning of section 12022.7, subdivision (a).

The trial court sentenced Patton on count 1 to life without the possibility of parole and on count 2 to the high term of six years, which the court stayed.

## IV.   DISCUSSION

A.    *Sufficiency of the Evidence*

Defendants challenge the sufficiency of the evidence in support of the jury's findings on the felony murder counts and the robbery and burglary special circumstance allegations, contending that the evidence against them did not show either that they intended to kill the victim or that they acted with reckless indifference to human life. Brandon also challenges the sufficiency of the evidence in support of the jury's findings that he (1) personally used a dangerous weapon and (2) caused great bodily injury. And, Brandon maintains that there was insufficient evidence to support the verdict on the felon in possession of a firearm count.

18

### 1. Standard of Review

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 . . . .)  In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 . . . .)  The same standard of review applies to the sufficiency of the evidence supporting special circumstance findings.  (*People v. Chatman* (2006) 38 Cal.4th 344, 389 . . . .)" (*People v. Powell* (2018) 5 Cal.5th 921, 944.)

### 2. Felony Murder and Special Circumstance Findings

#### a. Legal Principles

The prosecution proceeded against both defendants under a felony murder theory of liability.  That theory sought to impose liability under section 189 based on defendants' participation in two statutorily enumerated underlying felonies, robbery and burglary.  "[A] participant in enumerated crimes is liable under the felony-murder doctrine only if he or she was the actual killer; or, with the intent to kill, aided and abetted the actual killer in commission of first degree murder; or was a major participant in the underlying felony and acted with reckless indifference to

19

human life. (§ 189, subd. (e); Stats. 2018, ch. 1015, § 3; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1099–1100, 1102–1104 & fn. 9[, review granted Nov. 13, 2019, S258175] . . . .)" (*People v. Munoz* (2019) 39 Cal.App.5th 738, 749, fn. omitted, review granted Nov. 26, 2019, S258234.)

The prosecution also sought to increase the penalty for first-degree murder against both defendants based on a special circumstances murder theory under section 190.2. The "standard under section 189, subdivision (e)(3) for holding . . . a defendant liable for felony murder is the same as the standard for finding a special circumstance under section 190.2[, subdivision] (d), as the former provision expressly incorporates the latter." (*In re Taylor* (2019) 34 Cal.App.5th 543, 561.)

We need not decide whether the evidence was sufficient to show that Brandon was the actual killer of the victim, or aided and abetted the murder with the intent to kill, because, as we explain below, the evidence as to him was sufficient to show that he was a major participant in the robbery and burglary who acted with reckless indifference to human life. As to Patton, the Attorney General does not contest that the evidence was not sufficient to show that she was the actual killer of the victim or aided and abetted in the murder with the intent to kill. As we discuss below, the evidence was insufficient to show that she was a major participant in the robbery who acted with reckless indifference to human life.

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court provided general guidelines for determining whether a defendant was a major participant in the underlying felony who acted with reckless indifference to human life. The

court in *Banks, supra*, 61 Cal.4th 788 described the factors that may play a role in deciding whether a defendant was a major participant. (*Id.* at p. 803.) And, in *Clark, supra*, 63 Cal.4th 522, the court delineated certain factors relevant to whether a defendant acted with reckless indifference to human life. (*Id.* at pp. 618–623.) Those factors were recently summarized by the court in *In re Scoggins* (2020) 9 Cal.5th 667. "We analyze the totality of the circumstances to determine whether [a defendant] acted with reckless indifference to human life. Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? (*Clark, supra*, 63 Cal.4th at pp. 618–623.) "'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'" (*Id.* at p. 618, quoting *Banks, supra*, 61 Cal.4th at p. 803.)" (*In re Scoggins, supra*, 9 Cal.5th at p. 677.)

b.     Evidence Against Brandon

Brandon concedes that the evidence was sufficient to show that he was a major participant in the underlying felonies. He contends, however, that the evidence was insufficient to show that he acted with the necessary reckless indifference to human

21

life during the commission of those crimes.  Using the factors outlined by *Clark, supra*, 63 Cal.4th 522 (*Clark* factors), we conclude to the contrary.

As to whether Brandon was aware that weapons would be used in the planned robbery, he explained to the *Perkins* agent that the plan was for Patton to be armed with pepper spray to incapacitate the victim.  Pepper spray is not the type of weapon that would kill a victim.  Thus, this factor does not weigh in favor of finding that Brandon acted with reckless indifference.  The other factors, however, support such a finding.

For instance, the evidence demonstrated that Brandon was physically present during the robbery and had ample opportunity to restrain his cohorts or aid the victim.  Brandon admitted to the agent not only that he was present during the assault, but that he initially wrestled with the victim and later hit him with pots.[10]  In addition, Brandon's DNA was found on the interior of the front door and on a coffee table in the living room.  He also admitted that he had an opportunity to restrain his cohorts when he told the agent that he witnessed the victim being hit with pots during Tulanda's struggle with him.  But Brandon made no effort to prevent that brutal beating.  Similarly, Tulanda told the agent

---

[10]     Brandon maintains that the record is ambiguous as to whether he told the *Perkins* agent that he personally struck the victim with pots.  Brandon, however, said that his interaction with the victim "wasn't easy."  Further, his admission to hearing the victim say "[*Y*]*ou* gunna kill me?  . . . *You* gotta kill me" before the victim went "all the way out," supported an inference that Brandon was the person who "(INAUDIBLE) hit [the victim] with pots. . . . So he don't get back up no more."  (Italics added.)  Based on this evidence, a reasonable juror could have concluded that Brandon struck the victim with at least one pot.

that during the assault, the victim was rendered temporarily unconscious, but then "woke up" two minutes later. Again, Brandon made no effort at that time to aid the victim and instead resumed the assault. Finally, the evidence showed that Brandon had the opportunity to aid the victim following the assault, but he chose instead to leave him lying bloody and helpless on the kitchen floor[11] and to close the front door as they left the scene, ensuring that the victim, who lived alone, would not quickly be discovered.

The duration of the assault and robbery also supports a finding of reckless indifference. The evidence suggested that the assault and robbery of the victim played out over an extended period of time. Brandon told the agent that it began in the entryway to the victim's home, as evidenced by the framed photographs that had been knocked from the wall and broken on the tile floor. The fight then moved into the living room where a bicycle was knocked over, couches were displaced, and the victim was struck by a pot so hard that the pot's handle broke and it was dented. It then continued to a third phase in the kitchen where the victim was apparently stabbed repeatedly in the head and face and beaten with at least two other pots. As Tulanda explained to the agent, at one point the victim "went out," but he then awoke minutes later while Tulanda and his cohorts looked for the money they knew was hidden in the home. As Brandon admitted, the victim did not go "all the way out" until after he was beaten so severely with pots that he "[didn't] get back up no more." And, the search of the home by Brandon and his cohorts consumed more time, involving at least two upstairs bedrooms in

---

[11]     Tulanda told the agent that the victim was alive when he left him.

which carpet and padding were removed from the closet floors and, in one closet, the plywood subflooring was pried open.

Next, we consider whether there was evidence that Brandon knew of the likelihood that his cohorts would kill the victim and whether he made any efforts to minimize the risks of violence during the robbery. Although both Brandon and Tulanda told the *Perkins* agent that they did not go to the victim's house to kill him, Brandon and Tulanda immediately resorted to vicious physical violence once they entered the victim's home, which supported an inference that Brandon knew there was a likelihood that either he or Tulanda would kill the victim. Further, far from making any effort to minimize the risk of violence during the robbery, Brandon actively participated in such violence, over a lengthy period of time. Thus, these two factors also support a finding that Brandon acted with reckless indifference to human life. Having considered the *Clark* factors, we conclude there was sufficient evidence to support the jury's verdict of murder as to Brandon.

c.      Evidence Against Patton

Like Brandon, Patton concedes that there was sufficient evidence to support a finding that she was a major participant in the underlying robbery and burglary. We thus consider whether, under the *Clark* factors, the evidence supported a finding that she acted with reckless indifference to human life in the commission of those crimes.

As to whether Patton was aware that weapons would be used in the robbery and burglary, Patton told investigators that she convinced Tulanda and Brandon not to use guns during the

robbery and to instead accomplish it by stealth; and Brandon's statements to the *Perkins* agent corroborated that she was against the use of deadly force at the outset of her involvement. Patton also explained that she initially tried to accomplish the robbery using a combination of "sex appeal," alcohol, and Visine, again suggesting that she wanted to minimize the risk that the victim, whom she liked, could be seriously injured or killed by a deadly weapon. Finally, as we discuss above, the weapon that she did ultimately agree to use, pepper spray, was not the type of weapon that would suggest a reckless indifference to human life.

On the issue of whether Patton was present and had the opportunity to restrain her cohorts or aid the victim, the evidence showed that Patton was present during the initial physical assault and robbery. Among other things, she admitted to going to the victim's house and to alerting Brandon and Tulanda when the opportunity arose to enter the home and overwhelm the victim. She also admitted to following the men into the home and watching as they fought with the victim. Her DNA was found on the pepper spray canister at the scene, but she denied using it after initially handling it when purchased. In addition, she said that she saw Brandon repeatedly stab the victim and that she went upstairs, while the assault was ongoing, to search the bedroom closets for the hiding place for the victim's money. Thus, although the evidence showed that Patton was present for some portion of the assault, it did not establish that she had any meaningful opportunity to restrain her larger male cohorts, one of whom, Brandon, had physically abused her in the past causing her to fear him. And, although Brandon told the *Perkins* agent that Patton joined in the assault by hitting the victim with pots, the jury's not true findings on the allegations that Patton used a

25

deadly weapon and inflicted great bodily injury suggest that the evidence on this point was at best weak.

As for Patton's knowledge of her cohorts' propensity for violence, she told investigators that she had broken off her relationship with Brandon because he was abusive toward her. That evidence supported an inference that Patton was aware of Brandon's propensity for violence when she agreed to participate in the robbery. But Patton's awareness that Brandon could be abusive, by itself, was insufficient to support an inference of reckless indifference to human life. As the Supreme Court explained in *In re Scoggins, supra*, 9 Cal.5th 667, "Even if [the defendant] knew that [his two cohorts] were prone to some degree of violence, and even though the planned assault of [the victim] necessarily contemplated the use of violence, the evidence does not support a finding that [the defendant] acted with reckless indifference to human life. As noted, '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient'; reckless indifference to human life requires 'knowingly creating a "*grave risk of death*."' (*Banks, supra*, 61 Cal.4th at p. 808, italics added.)" (*In re Scoggins, supra*, 9 Cal.5th at p. 682.) Moreover, as explained above, the evidence also showed that Patton made affirmative efforts to ensure that the robbery would not become violent.

Taken together, we conclude that the evidence related to the *Clark* factors was insufficient to support the jury's finding that Patton acted with reckless indifference to human life during her participation in the robbery. Her murder conviction and the special circumstance findings must therefore be reversed and the matter remanded for a full resentencing hearing. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

26

3.    Substantial Evidence:  Personal Use and
      Great Bodily Injury Findings against Brandon

Brandon's challenges to the sufficiency of the evidence in support of the jury's personal use of a deadly weapon (section 12022, subd. (b)(1)[12]) and great bodily injury (section 12022.7, subd. (a)[13]) findings are based on his assertion that, although Brandon may have had physical contact with the victim in the entryway and living room, there was no evidence that Brandon personally used a pot to hit the victim.  We disagree.

As we discuss above, there was sufficient evidence for a reasonable juror to conclude that Brandon admitted to personally striking the victim with at least one pot.  Further, the evidence of the dented pots found at the scene corroborated the inference that these pots were used forcefully.  Finally, the coroner's testimony that blunt force trauma and stabbing caused the victim to bleed to death and that hitting someone in the head with pots could cause hemorrhaging into tissue supported an inference that the victim suffered great bodily injury as a result of being hit in

---

[12]    Section 12022, subdivision (b)(1) provides:  "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

[13]    Section 12022.7, subdivision (a) provides:  "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

27

the head with pots.  Taken together, the evidence supported the findings that Brandon used at least one pot as a deadly weapon and caused great bodily injury.

> 4.     Substantial Evidence:  Possession of Firearm
>         By Brandon

Brandon's challenge to his conviction on count 3 for being a felon in possession of a firearm in violation of section 29800[14] is based on his contention that there was no substantial evidence linking him to the converted garage where the weapon was found.  According to Brandon, the jurors' confusion, as evidenced by their questions during deliberations,[15] showed that the evidence of the converted garage being used as a recording studio was insufficient to establish that he lived there.

"Possession [of a firearm] may be physical or constructive, and more than one person may possess the same contraband. (*People v. Williams* (2009) 170 Cal.App.4th 587, 625 . . . [drugs and weapons found in room used by defendant, in house owned

---

[14]     Section 29800, subdivision (a)(1) provides:  "*Any person who has been convicted of a felony* under the laws of the United States, the State of California, or any other state, government, or country, or of an offense enumerated in subdivision (a), (b), or (d) of [s]ection 23515, or who is addicted to the use of any narcotic drug, *and who* owns, purchases, receives, or *has in possession or under custody or control any firearm is guilty of a felony*."  (Italics added.)

[15]     Among other things, the jurors asked, "On the weapons possessing charge, I am still very confused.  Who did this gun belong to?  There were multiple people who lived in the house."

by someone else].)  Possession may be imputed when the contraband is found in a place which is immediately accessible to the joint dominion and control of the accused and another. (*People v. Newman* (1971) 5 Cal.3d 48, 53 . . . .)  In *People v. Nieto* (1966) 247 Cal.App.2d 364 . . . , a firearm was found under the central part of the front seat of the car which the defendant was driving.  Notwithstanding the passenger's testimony that the gun was his and the defendant's testimony that he did not know about the gun, the court found the presence of the gun under the front seat, together with the defendant's admission that he lied when police asked for the passenger's name, constituted substantial circumstantial evidence that the defendant was in possession of the gun.  (*Id.* at pp. 366–367.)" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410.)

The evidence supported a reasonable inference that Brandon resided in the garage located on East 113th Street from which deputies recovered a handgun from a bag on the bed. Police had observed Brandon in front of the residence prior to his arrest and Brandon provided the East 113th Street address as his residence during his booking.  Further, the items found in the garage demonstrated that someone who recorded music lived there; and Brandon described himself to the *Perkins* agent as someone who engineered, produced, shot videos, and "[did] music."

Given that the gun was found *on the bed* inside that location, the evidence was sufficient to support a finding that it was within Brandon's dominion and control and, therefore, that he was in constructive possession of it.

B.    *Ineffective Assistance of Counsel*

Brandon additionally contends that he received ineffective assistance of counsel because his trial attorney failed to request a modification to the instructions on felony murder and felony-murder special circumstances that included the factors for reckless indifference to human life set forth in *Clark, supra*, 63 Cal.4th 522.[16]  Patton argues that she received ineffective assistance because her trial attorney failed to move to suppress her confession during her interview with detectives based on *Miranda*.

1.    Legal Principles

When challenging a conviction on grounds of ineffective assistance, "[a defendant] 'must show that counsel's performance was deficient, and that the deficiency prejudiced the defense.' [Citations.]  On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' [Citation.]  '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be

_____

[16]    Having concluded that Patton's murder conviction and special circumstances finding must be vacated, we need not consider the merits of her contention that her counsel was ineffective for failing to request modifications of these same jury instructions.

30

no conceivable reason for counsel's acts or omissions.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

    2.    <u>Failure to Request Instruction on *Clark* Factors</u>

    a.    Background

Brandon's jury was instructed on first degree felony murder using CALCRIM No. 540B. That instruction included the following regarding the reckless indifference requirement: "A person *acts with reckless indifference to human life* when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death." The instruction, however, went on to discuss the major participant requirement in detail using the *Banks* factors.

On the robbery and burglary special circumstance allegation, the jury was instructed with CALCRIM No. 703, using the same brief definition of reckless indifference to human life. But, the instruction again included a detailed discussion of the major participant requirement using the *Banks* factors.

Brandon's counsel did not ask that the *Clark* factors be included in the instructions on felony murder or in the instructions on the robbery and burglary special circumstance allegations. And, counsel did not make an argument on the reckless indifference element using the *Clark* factors.

    b.    Analysis

Brandon concedes that the trial court did not have a sua sponte duty to instruct on the reckless indifference requirement

using the *Clark* factors, but notes that the court would have given the instruction if requested by counsel. Based on the record, we cannot conclude that there was no rational tactical or strategic purpose for failing to ask for an instruction on the *Clark* factors. For example, given the evidence discussed above concerning the *Clark* factors, counsel may have reasonably decided that an instruction on the *Clark* factors would only have served to highlight the substantial adverse evidence against Brandon that supported a finding of reckless indifference. We therefore conclude that defendant cannot prevail on his claim on direct appeal. Any such claim is more appropriately decided in a habeas corpus proceeding.

### 3. Failure to Suppress Patton's Confession

Patton raises a claim of ineffective assistance based on her counsel's failure to move to suppress her confession during her interview by investigators. According to Patton, because the *Miranda* warning given by the detective at the beginning of her interview was incomplete and ambiguous, no reasonable attorney would have failed to move the court to suppress it.

#### a. Background

At the beginning of her interview with Detectives Duncan and Valencia, Patton admitted that she had been arrested before and that she was familiar with her rights. Detective Valencia informed her that he was going to explain her rights to her "just so [she knew]," and told her that "if [she] didn't understand them, [she should] tell [him]." The detective then stated: "You have the

right to remain silent. Anything you say can and will be used against you in a court of law. [¶] You have the right to an attorney. If you can't afford one, they'll give you one for free. Okay? [¶] One through four, do you understand what I just said?" Patton responded, "Yes," and the detectives proceeded with the interview. Neither detective specifically advised Patton that she had a right to an attorney before and during the detectives' questioning.

### b.     Analysis

We will assume that there was a legitimate basis to move to suppress Patton's statements to Detective Valencia under *Miranda*. We cannot, however, conclude on this record that there was no reasonable tactical or strategic reason for failing to make such a motion. The evidence against Patton included the DNA evidence from the pepper spray canister which placed her at the crime scene. It also included the *Perkins* statements of Tulanda and Brandon that corroborated that she was at the scene. And, Brandon specifically stated that Patton helped formulate the plan for the robbery and willingly participated in it by befriending the victim and joining in the brutal assault on him by first attempting to pepper spray him and then hitting him repeatedly with a pot. Given this evidence, Patton's counsel may have decided that the exculpatory statements she made during the interview—including that she (1) had been an unwilling participant who was forced to take part in the robbery; (2) did not have any ill-will toward the victim or any desire to hurt him; and (3) did not use the pepper spray against the victim or hit him with any weapon—would benefit her case without requiring her

33

to testify and exposing her to cross-examination. Indeed, despite Brandon's statements, the jury found not true the allegations that Patton personally used a deadly weapon and personally inflicted great bodily injury. On this record, we reject Patton's claim on direct appeal that counsel was ineffective in failing to make a motion to suppress her confession.

C.     *Patton's Confrontation Clause Challenge*

Patton challenges the trial court's ruling allowing her jury to hear the statements made by Brandon during the *Perkins* operation that implicated her in the robbery and assault of the victim. According to Patton, the admission of the statements from a non-testifying codefendant violated her confrontation clause rights under the *Aranda/Bruton* line of cases.[17]

1.     Background

Prior to trial, the prosecution filed a written motion to introduce the *Perkins* statements against both defendants, arguing that they did not violate *Miranda*, were not hearsay, and were non-testimonial under *Bruton, supra*, 391 U.S. 123. At the hearing on the motion, Patton's counsel interposed "general" objections on the grounds that admission of the statements would violate her rights under the Fifth and Sixth Amendments, including her right "to confront and cross-examine." Counsel also argued that the statements made by Brandon were self-serving and unreliable. The trial court granted the motion, ruling that

_____

17     *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

34

the statements were trustworthy given the circumstances under which they were made.

2. Legal Principles

The Sixth Amendment to the United States Constitution provides that "'"[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."'" (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 65 (*Gallardo*).) In *Crawford v. Washington* (2004) 541 U.S. 36, the United States Supreme Court "'held that the admission of "testimonial" out-of-court statements violates a criminal defendant's confrontation rights unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination [citation], or waived that right by his own wrongdoing [citation].' [Citation.] The court further held that the admission of 'nontestimonial' statements 'is the concern of state and federal rules of evidence, not the [Sixth Amendment] Confrontation Clause. [Citations.]" (*Gallardo, supra*, 18 Cal.App.5th at p. 66.)

3. Analysis

The parties disagree on whether Patton forfeited her confrontation clause challenge to Brandon's *Perkins* statements by failing to adequately specify in the trial court that those statements were testimonial and therefore inadmissible under the confrontation clause. We will assume for the sake of argument that Patton did not forfeit her confrontation clause challenge, but nevertheless reject it because, under well-

35

established California case law, those statements were nontestimonial and therefore admissible. (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402; see *Gallardo, supra*, 18 Cal.App.5th at pp. 67–68; *People v. Almeda* (2018) 19 Cal.App.5th 346, 362–363.) Although Patton maintains that these cases are mistaken, we decline on these facts to depart from that established line of authority and the federal cases to the same effect. (See, e.g., *United States v. Marguet-Pillado* (9th Cir. 2009) 560 F.3d 1078, 1085 [the determinative factor in determining whether a declarant bears testimony is the declarant's awareness or expectation that his or her statements may later be used at a trial].)

D. *Cumulative Error*

Patton contends that even if her ineffective assistance of counsel claim regarding the failure to suppress her statement and confrontation clause challenge were not individually prejudicial, their cumulative impact on her trial was prejudicial. Because we have concluded that Patton is unable to prevail on her ineffective assistance of counsel claim on appeal and the trial court did not commit the asserted confrontation clause error, there is no error to cumulate. (*In re Reno* (2012) 55 Cal.4th 428, 483.)

E.      *Sentencing Issues as to Brandon*

   1.      <u>Eighth Amendment Challenge</u>

   Brandon contends that the jury's true findings on the robbery and burglary special circumstance allegations within the meaning of section 190.2 should be reversed because, in light of the changes to that section under Senate Bill No. 1437, it violates the narrowing principle of the Eighth Amendment.  Because we deem California Supreme Court authority to be controlling on this issue (see e.g. *People v. Winbush* (2017) 2 Cal.5th 402, 488; *People v. Abilez* (2007) 41 Cal.4th 472, 528), we are bound by principles of stare decisis to follow it and reject Brandon's Eighth Amendment challenge to his sentence.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

   2.      <u>Joint and Severable Liability for Restitution</u>

   Brandon additionally argues that his abstract of judgment should be modified to reflect that the trial court's restitution order was imposed jointly and severally on all defendants.  The Attorney General agrees.  At Patton's restitution hearing, the trial court ordered restitution to the victim's daughter, Reneaka Roper, and the California Victim's Compensation Board, and specified that such order shall be "joint and several" as to "other defendants."[18]  But Brandon's abstract of judgment does not reflect the joint and several aspect of the restitution orders.  We

---

[18]     Codefendant Tulanda was tried separately.

37

therefore agree with the parties that Brandon's abstract of judgment should be modified to reflect the trial court's order.

###     3.     One-Year Section 667.5 Sentence Enhancement

Brandon also maintains that the one-year enhancement imposed on his sentence under section 667.5, subdivision (b) must be stricken because the amendments to that section under Senate Bill No. 136, effective January 1, 2020, must be applied retroactively. The Attorney General concedes, and we agree that the amendments apply retroactively to Brandon's sentence and that the one-year enhancement should be stricken. (*People v. Winn* (2020) 44 Cal.App.5th 859, 872–873.)

# V.    DISPOSITION

Brandon's judgment of conviction is affirmed, but Patton's first degree felony murder conviction and the true findings on the special circumstance allegations as to her only are reversed.  The matter is remanded to the trial court with directions:  (1) to conduct a resentencing hearing on the remaining count of conviction as to Patton; (2) to strike the one-year section 667.5, subdivision (b) enhancement imposed on Brandon's sentence and modify his abstract of judgment to reflect that reduction in sentence; and (3) to modify Brandon's abstract of judgment to reflect that the restitution order was imposed jointly and severally on him and Tulanda.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

BAKER, J.

39

## PEOPLE v BRANDON – B300932

RUBIN, P. J. – Concurring:

I have signed the majority opinion. I write separately because I have reservations about the continued vitality of the rule that trial courts have no sua sponte duty to instruct on the specific factors that may be helpful to a jury's understanding of "reckless indifference to human life."

The majority points out that defendants here "concede that the trial court did not have a sua sponte duty to instruct on the reckless indifference requirement using the [*People v.*] *Clark* factors." (See *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).) Defendants' concession is understandable because our Supreme Court has held there is no sua sponte duty. "Consistent with our decision in *Dellinger,*[1] we conclude the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony. This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in [Penal Code] section 190.2(d), and as defined in *Tison.*[2] The phrase therefore does not have a technical meaning peculiar to the law, and the trial court had no sua sponte duty to further define the statutory phrase for the jury." (*People v. Estrada* (1995) 11 Cal.4th 568, 578.)

That was 26 years ago. Much has changed in the world of felony murder. *People v. Banks* (2015) 61 Cal.4th 788, and *People v. Clark, supra*, 63 Cal.4th 522 gave new meaning to the terms

---

[1]     *People v. Dellinger* (1989) 49 Cal.3d 1212.

[2]     *Tison v. Ariz.* (1987) 481 U.S. 137.

1

"major participant" and "reckless indifference to human life." *Banks* identified several factors to be considered in assessing whether a defendant was a major participant in the crime. *Clark* articulated factors related to whether a defendant acted with reckless indifference to human life. In the context of resentencing hearings under section 1170.95, this court has recognized that *Banks* and *Clark* interpreted "major participant" and "reckless indifference to human life" "in a significantly different, and narrower manner than courts had previously" (*People v. Torres* (2020) 46 Cal.App.5th 1168, 1179 abrogated on another ground by *People v. Lewis* (2021) 11 Cal.5th 952. See also *People v. York* (2020) 54 Cal.App.5th 250, 258, review granted Nov. 18, 2020, S264954 ["As a consequence, a pre-*Banks* and *Clark* special circumstance finding cannot preclude eligibility for relief under the section 1170.95 *as a matter of law*, because the factual issues that the jury was asked to resolve in a trial that occurred before *Banks* and *Clark* were decided are not the same factual issues our Supreme Court has since identified as controlling"]; *People v. Smith* (2020) 49 Cal.App.5th 85, 93–94, review granted July 22, 2020, S262835; but see *People v. Allison* (2020) 55 Cal.App.5th 449, 452, & fn. 2.)

Following *Banks* and *Clark,* CALCRIM 703 was amended to include various factors the Supreme Court had identified, which the jury may consider in determining "major participant" and "reckless indifference to human life."[3] CALCRIM 703

---

[3] CACRIM No. 703 was amended twice, once in 2016 (major participant) and again in 2019 (reckless indifference to human life), presumably because *Banks* and *Clark* were decide nearly a year apart. Senate Bill No. 1437 became effective on January 1, 2019.

2

identifies nine non-exclusive factors for reckless indifference. For major participant, it lists six.[4]

Then, the Legislature enacted Senate Bill No. 1437 and Penal Code section 1170.95. In section 1 of the uncodified version of the statute, the Legislature made several findings, including: "(d) It is a bedrock principle of the law and of equity that a person should be punished for his or her actions according to his or her own level of individual culpability . . . (f) It is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." In *People v. Avila* (2020) 57 Cal.App.5th 1134, 1151, Justice Dhanidina wrote for the court, "Senate Bill No. 1437 (2017-2018 Reg. Sess.) thus effects a sea

---

[4] "Following the decisions in *Banks* and *Clark*, the Judicial Council's Advisory Committee on Criminal Jury Instructions added optional language to CALCRIM No. 703 designed to capture the culpability factors enunciated in those decisions. (See Bench Note to CALCRIM No. 703 (Feb. 2016 and Apr. 2020 revisions) [*Banks* and *Clark* 'identified certain factors to guide the jury in its determination of' the major participant and reckless indifference to human life issues, but did not hold that the court has a sua sponte duty to instruct on those factors].) The accompanying Bench Note advises that the trial court should determine whether these optional instructions setting forth guidance on the *Banks* and *Clark* factors need be given. (*Ibid.*)" (*People v. Secrease* (2021) 63 Cal.App.5th 231, 252, fn. 12, review granted June 30, 2021, S268862.) In neither *Banks* nor *Clark* did our Supreme Court discuss whether a trial court must give an instruction of this nature sua sponte.

change in sentences that have been and will be imposed on various offenders."

It may not follow automatically from these developments that a trial court must instruct sua sponte on the factors associated with major participant and reckless indifference. But it seems to me that *Estrada's* holding that a court has no sua sponte duty to instruct on "reckless indifference to human life" may be ripe for reconsideration. In *Estrada's* words, the two terms may have developed "a technical meaning peculiar to the law", one not easily understood by jurors. (*People v. Estrada, supra*, 11 Cal.4th at p. 578.)

RUBIN, P. J.

The People v. Christopher Brandon et al.
B300932


BAKER, J., Concurring


I join the court's opinion, which reverses defendant Acorri Patton's (defendant's) murder conviction and otherwise affirms in the main. I write separately to say more about why I do not believe defendant has presented grounds to reverse her remaining robbery conviction for what is often referred to as *Bruton/Aranda* error. (*Bruton v. United States* (1968) 391 U.S. 123; *People v. Aranda* (1965) 63 Cal.2d 518.)

To my knowledge, our Supreme Court has not been recently asked to decide whether there exists a constitutional basis to limit or forbid using statements made by a nontestifying defendant during a so-called Perkins operation[1] against another defendant—including whether the Perkins setting might be sufficiently unique as to affect a confrontation or due process analysis. Instead, these use of nontestifying co-defendant statement issues have been explored largely through the prism of state hearsay rules. (See, e.g., *People v. Grimes* (2016) 1 Cal.5th 698 [citing cases].)

Defendant makes only a Confrontation Clause argument in this appeal; she does not argue co-defendant statements implicating her should have been excluded as hearsay under state law. I am persuaded in this case that there is no basis for

---

[1]     So named after *Illinois v. Perkins* (1990) 496 U.S. 292.

concluding the statements made during the Perkins operation should have been excluded on Confrontation Clause grounds.


BAKER, J.